# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GWEN ANN RAMIREZ,<br><br>               Plaintiff,<br><br>      v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>               Defendant. | Case No.  1:19-cv-01323-SAB<br><br>ORDER GRANTING IN PART PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS<br><br>(ECF No. 19, 20, 21) |

## I.

## INTRODUCTION

Gwen Ann Ramirez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from hypothyroidism, obesity, lower back pain, bipolar disorder; posttraumatic stress disorder ("PTSD"); and history of pelvic prolapse.  For the reasons set forth below, Plaintiff's Social Security appeal shall be granted in part.

---

[1] The parties have consented to the jurisdiction of the United States magistrate judge and the case has been reassigned to the magistrate for all purposes.  (See ECF Nos. 7, 9, 22.)

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on September 15, 2015, and a Title XVI application for supplemental security income on July 1, 2015.  (AR 97, 98, 99, 100.)  Plaintiff's applications were initially denied on December 8, 2015, and denied upon reconsideration on March 18, 2016.  (AR 134-138, 145-150.)  Plaintiff requested and received a hearing before Administrative Law Judge Matilda Surh ("the ALJ").  Plaintiff appeared for a hearing on February 12, 2018.  (AR 40-68.)  On April 9, 2018, the ALJ found that Plaintiff was not disabled.  (AR 18-33.)  The Appeals Council denied Plaintiff's request for review on March 29, 2019.  (AR 7-9.)

### A.    Hearing Testimony

Plaintiff appeared and testified at the February 12, 2018 hearing with counsel.  (AR 44-60.)  Plaintiff was born on March 25, 1964, and lives alone in a first floor apartment.  (AR 44.)  Plaintiff graduated high school and completed vocational training as an emergency medical technician.  (AR 44.)  Plaintiff is not currently working and supports herself with help from her father and food stamps.  (AR 44.)

Plaintiff worked as an administrative assistant and assistant manager at a mobile home park Monday through Friday and would clean the clubhouse Friday evenings.  (AR 45.)  She would set up and clean up after parties in the clubhouse.  (AR 45.)  Plaintiff was on call on the weekends.  (AR 45.)  She last worked on March 9, 2014.  (AR 45.)  Plaintiff was required to lift about twenty-five pounds.  (AR 45.)  She would answer phones, work on the computer, collect rent, walk around to pass out rent, serve notices, and correspond with residents.  (AR 46.)  Plaintiff stopped working because she had problems with a new manager.  (AR 48.)  The manager wanted Plaintiff to do things the manager's way and Plaintiff wanted to do things her own way and did not feel like the manager's way was right.  (AR 48.)

Plaintiff is not able to work because she does not do well with other people.  (AR 47.)  She cannot get out of bed.  (AR 47.)  She gets anxiety and has problems with her bowels and soils herself a lot.  (AR 47.)  Plaintiff thinks she is okay but has constant conflict with her

daughters and different people that she comes across.  (AR 48.)  She approaches things differently and is always in some kind of mess.  (AR 48.)  People think that she is harsh.  (AR 48.)  Her father and daughter never know what to expect from her.  (AR 48.)  She might fly off the handle or give them roses.  (AR 48.)

Plaintiff cannot get out of bed because of her depression.  (AR 48.)  She feels down, defeated, like she has no purpose.  (AR 48.)  Plaintiff had a mental breakdown and did not look for a job after she left the mobile home park.  (AR 48.)  Plaintiff was taking care of her brother who died from cancer, and quitting her job caused her to lose her home.  (AR 48.)  When she was working, her prior manager would let her go to work in her pajamas or answer the phones from her apartment.  (AR 49.)  The manager was never there and did not care as long as the phones were answered.  (AR 49.)  When she first started, she did go into the office to work.  (AR 49.)  Plaintiff did not really work.  (AR 49.)  She would put a sign on the door that the office was closed and to call this number for emergencies only, then she would go lay on her couch.  (AR 49.)  Her prior manager did not care that Plaintiff did not do anything.  (AR 49.)  Once in a while, the manager would come in and tell Plaintiff that things needed to get done and they would do the work together.  (AR 49.)  It was hard for Plaintiff to collect rents.  (AR 49.)  She was very undependable, did not go to work, always had an excuse, and was always sick.  (AR 49.)

Plaintiff had surgery for rectocele and cystocele in 2015.  (AR 50.)  The doctor told her that she could not fix the back, but she did fix the front.  (AR 50.)  Over time, it has gotten worse and it will just come out and she will have to dig the stool out.  (AR 50-51, 55.)  Plaintiff takes a laxative and then her stool turns to diarrhea.  (AR 51.)  Plaintiff wears a diaper probably twelve days a month.  (AR 51.)  Plaintiff has accidents about eleven days a month.  (AR 58.)  Plaintiff went to pick up food stamps and had an accident.  (AR 51.)  She has been referred to a surgeon for her rectal problem.  (AR 51.)

Plaintiff is no longer taking phentermine because she cannot afford it.  (AR 51.)  She has gained 60 pounds since she stopped working.  (AR 51.)  She only took two prescriptions of the phentermine.  (AR 51.)  It is still listed as a current medication, but she does not have the money

1   to pick it up at the pharmacy.  (AR 52.)

2        Plaintiff stopped going to pain management because she had a conflict with the doctors.
3   (AR 52.)  She had taken oxycontin that was prescribed for a friend because she had run out of
4   her medication and it showed up in testing.  (AR 52.)  They told her not to do that again.  (AR
5   52.)  She did not like the way the doctor treated her and did not go back.  (AR 52.)  She did get
6   sent to physical therapy and had injections.  (AR 52.)  Her primary care doctor has now taken
7   over her care.  (AR 52.)

8        Plaintiff went to physical therapy and had injections for her lower back, spine, and
9   nerves.  (AR 53.)  Plaintiff takes gabapentin for her back that is very helpful.  (AR 53.)  She has
10  pain in her thighs and the gabapentin really helps that.  (AR 53.)  Plaintiff did take Norco and it
11  made her tired.  (AR 59.)  All her medications make her tired.  (AR 59.)  Plaintiff has been
12  taking her medications the wrong way.  (AR 59.)  She was taking them all in the morning and
13  was like a zombie.  (AR 59.)  She decided to split them up and take half in the morning and half
14  at night and she was still drowsy.  (AR 59.)  Her therapist told her just to take her medication at
15  night.  (AR 59.)  She started doing that and she has seen a little difference although she was still
16  falling asleep while waiting.  (AR 59.)

17       Plaintiff does not do any chores at home, she has in-home support services.  (AR 53.)
18  She receives 68 hours a month and receives help four hours a day.  (AR 53.)  The in-home
19  worker does Plaintiff's laundry, cooking, will change her sheets, and talks to her.  (AR 53.)
20  Plaintiff has had in-home support for two and a half months.  (AR 53.)  Plaintiff also has her
21  medications delivered because she is no longer driving.  (AR 54.)  Plaintiff was in two accidents
22  within three months and believes it was due to her medications so she stopped driving.  (AR 54.)
23  She does not have a vehicle and does not want to get into trouble.  (AR 54.)  Her in-home
24  support services person drives her.  (AR 54.)  On a good day, Plaintiff will go to the grocery
25  store with her.  (AR 54.)  Prior to that, Plaintiff's 80 year old father would help her, but he is
26  getting sick and is forgetful.  (AR 54.)

27       On a bad day, Plaintiff will go from being constipated to having diarrhea.  (AR 55.)  She
28  is following the doctor's orders to eat a healthy, high-fiber diet and has medication to help her be

1  regular.  (AR 55.)  Her in-home worker will walk her up the block and back or across the street

2  to the shopping center.  (AR 55.)  She will not go out of the house unless the in-house worker

3  helps her.  (AR 55.)  Plaintiff is able to walk, but if she stands too much her sciatic starts

4  bothering her.  (AR 56.)  Plaintiff is always in bed, but she is able to stand about two hours at

5  one time.  (AR 56, 59.)  Plaintiff can lift a 10 pound sack of potatoes.  (AR 59.)  The cat litter she

6  lifts is pretty heavy.  (AR 60.)

7      Plaintiff has no interest in anything.  (AR 60.)  She does no activities and has no friends.

8  (AR 60.)  She watches television or will leave the television on for noise.  (AR 60.)  She has one

9  channel that she likes.  (AR 60.)  Plaintiff does not read, is not on the internet, and does not do

10  puzzles.  (AR 60.)  Sometimes Plaintiff is able to concentrate on the television.  (AR 60.)  When

11  there is a new show on she might concentrate.  (AR 60.)

12      Plaintiff sees a psychiatrist every other month who prescribes medication.  (AR 56.)  She

13  also sees a therapist once a week.  (AR 56.)  She has been seeing the therapist since 2015.  (AR

14  56.)  Her mental conditions have gotten somewhat better since she first stopped working.  (AR

15  57.)  When she first quit she wanted to die and that her family would be better off without her.

16  (AR 57.)  She can feel her mental symptoms coming on and they cycle about every two weeks.

17  (AR 57.)  When she is manic she will be vacuuming three times a day.  (AR 57.)  She is very

18  compulsive and gambles.  (AR 57.)  When she was working she would gamble.  (AR 57.)  She

19  does everything to excess.  (AR 57.)  She will be down two weeks and then up for about a week

20  and a half.  (AR 57.)  When she is down she will not get out of bed or do anything.  (AR 57.)

21  Plaintiff will not get out of bed 16 to 18 days a month.  (AR 57.)

22      Plaintiff never leaves her bedroom when she is in her apartment.  (AR 58.)  She lays in

23  bed and eats potato chips or whatever is easy to grab because it is too hard to get up and cook.

24  (AR 59.)  Plaintiff has a cat and even the cat gets freaked out when it starts getting really bad.

25  (AR 59.)  Before Plaintiff had in-home services, her dad would come and sometimes take out the

26  trash and sometimes she could.  (AR 59.)

27      Judith Najarian, a vocational expert ("VE"), also testified at the hearing.  (AR 61-67.)

28  After discussing how the ALJ would like Plaintiff's prior work categorized, the VE found

5

Plaintiff's prior work to be janitor, Dictionary of Occupational Titles ("DOT") 312.664-101, medium, SVP 3; rental agent, DOT 250.357-014, light, SVP 6; and receptionist, DOT 237.367-038, sedentary, SVP 4.  (AR 63.)  Overall, the VE found that, parsing out the janitor position for which Plaintiff was paid separately, Plaintiff's position was light, performed as medium, SVP 5.  (AR 64.)

The ALJ proffered a hypothetical of an individual of the same age, education, and work experience as Plaintiff that could lift 20 pounds occasionally and 10 pounds frequently; could stand, walk and or sit 6 hours out of 8 hours; and could occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl; and is capable of non-complex and routine tasks with one to three step instructions; could maintain concentration and attendance for two hour increments; could sustain an 8 hour workday and 40 hour workweek on a sustained basis; could relate to and accept direction from supervisors; could remain socially appropriate with coworkers and the public; could avoid workplace hazards; can respond to change and set realistic goals independently; and can travel.  (AR 64-65.)

The VE opined that this individual could not perform Plaintiff's previous work.  (AR 65.)  This individual could work at other light unskilled jobs, such as a router, DOT 222.587-038, light, SVP 2, 53,503;[2] a marker, DOT 209.587-034, light, SVP 2, 292,310; and a stock checker, apparel, DOT 299.667-014, light, SVP 2, 74,240.  (AR 65.)

The ALJ proffered a second hypothetical where this individual would need ready access to the restroom and should only occasionally work with the public or with coworkers.  (AR 65.)  The VE opined that no past work would be available, but this individual would be able to work at the previously identified job as a router or a marker.  (AR 65.)  This individual could also work as a mail sorter, DOT 209.687-026, light, SVP 2, 56,985.  (AR 66.)  The DOT does not address availability of a restroom, but the VE offered her own opinion.  (AR 66- 67.)

The ALJ asked if there would be work for this individual if they were to miss three days per month on a routine basis.  (AR 66.)  The VE opined there would be no work for an individual

---

[2] It would appear that this is the number of jobs in the national economy.

1  who would routinely miss three days of work per month.  (AR 66.)

2      Plaintiff's counsel proffered the third hypothetical of an individual needing ready access

3  to a restroom every hour.  (AR 67.)   The VE opined, based on her opinion, that access to a

4  restroom every hour in an unskilled position would be an accommodation that an employer

5  would be willing to make, but it is not as normally performed in the labor market and there

6  would be a solid chance of losing employment and no ongoing work.  (AR 67.)

7      Plaintiff's attorney proffered a fifth hypothetical where the individual would be off task

8  fifteen percent of the workday.  (AR 67.)  The VE opined that there would be no ongoing work

9  for this individual.  (AR 67.)

10    **B.    ALJ Findings**

11    The ALJ made the following findings of fact and conclusions of law.

12  • Plaintiff meets the insured status requirements of the Social Security Act through

13    December 31, 2019.

14  • Plaintiff has not engaged in substantial gainful activity since the alleged onset date of

15    March 10, 2014.

16  • Plaintiff has the following severe impairments: bipolar disorder; PTSD; and history of

17    pelvic prolapse.

18  • Plaintiff has the residual functional capacity to perform light work as defined in 20

19    C.F.R. §§ 404.1567(b) and 416.967(b) except Plaintiff can occasionally climb ramps and

20    stairs, balance, stoop, kneel, crouch, and crawl.  Plaintiff is capable of non-complex and

21    routine tasks with 1-3 step instructions.   Plaintiff can maintain concentration and

22    attention for two-hour increments.  Plaintiff can sustain an eight-hour workday and 40-

23    hour workweek on a sustained basis.  Plaintiff can relate to and accept direction from

24    supervisors and be socially appropriate with coworkers and the public.  Plaintiff can have

25    occasional contact with the public and with co-workers.  Plaintiff must avoid workplace

26    hazards, can respond to change and set realistic goals independently, and can travel.

27    Plaintiff must have ready access to a restroom.

28  • Plaintiff is unable to perform any past relevant work.

- Plaintiff was born on March 25, 1964, and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Plaintiff subsequently changed age category to closely approaching advanced age.

- Plaintiff has at least a high school education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job skills.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability, as defined in the Social Security Act, from March 10, 2014, through the date of this decision.

(AR 23-33.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520;[3] Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.

---

[3] The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. §404.1501 et seq., however Plaintiff is also seeking supplemental security income, 20 C.F.R. § 416.901 et seq. The regulations are generally the same for both types of benefits. Therefore, further references are to the disability insurance benefits regulations, 20 C.F.R. §404.1501 et seq.

Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.

Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

1          **IV.**

2          **DISCUSSION AND ANALYSIS**

3          Plaintiff contends that the ALJ erred by rejecting the limitations opined by the reviewing

4    physicians in favor of her own lay opinion; discounting the opinion of LMFT Tracy Fulton;

5    failing to develop the record and obtain an assessment of Plaintiff's physical limitations; and

6    failing to consider Plaintiff's back impairment at step two of the sequential evaluation process.

7          **A.      Other Medical Opinion**

8          Plaintiff contends that the ALJ failed to offer acceptable reasons to reject the opinion of

9    her treating therapist, Tracy Fulton.  Plaintiff argues that the ALJ stated that the record only

10   showed treatment through April 2016, and that the opinion was issued in November 2017 is not a

11   valid reason because it shows that the ALJ failed in her duty to further develop the record.

12   Plaintiff also argues that the ALJ's finding that Ms. Fulton's opinion was inconsistent with the

13   medical record is incorrect because the Ninth Circuit has recognized that symptoms can wax and

14   wane and a few instances of temporary improvement should not be used to discount the opinion

15   and the ALJ cherry picked portions of the record to discount the opinion.

16         Defendant counters that the mental findings are supported by the numerous unremarkable

17   findings in the record that support the opinion of the agency physicians and are inconsistent with

18   the opinion of Ms. Fulton.  Defendant argues that the ALJ properly gave more weight to the

19   opinions of Plaintiff's treating doctors, nurse practitioner, and nurses who generally found that

20   Plaintiff had an intact memory, attention and concentration, judgment and insight.  Defendant

21   argues that along with the opinions of the agency physicians there is substantial support that the

22   ALJ provided germane reasons to reject Ms. Fulton's opinion.

23         On reply, Plaintiff continues to argue that the ALJ erred by referencing temporary periods

24   of improvement and failed to evaluate her mental impairments in the context of the record as a

25   whole.

26         Medical sources are divided into two categories: acceptable medical sources and other

27   medical sources.  20 C.F.R. § 416.902.  Under the regulations, a medical opinion is a statement

28   from an acceptable medical source that reflects judgment about the nature and severity of the

claimant's impairments.  20 C.F.R. § 416.927(a)(1).  For claims filed before March 27, 2017, only licensed physicians and other qualified specialists were "acceptable medical sources" under 20 C.F.R. § 416.927(a).  See SSR 06-3p: Sources of Evidence; Disability Determinations by Other Agencies.   Mental health counselors, licensed clinical social workers, and nurse practitioners were "other sources" under 20 C.F.R. § 404.1513(d).  Id.  Social workers are other medical sources under the regulations.  Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1224 (9th Cir. 2010).

The ALJ must consider the opinions of medical providers who are not within the definition of an acceptable medical source.  20 C.F.R. § 404.1527(f).  Opinions of these sources are not entitled to the same deference as an acceptable medical source, and an ALJ may only disregard other medical source testimony by providing "reasons germane to each witness for doing so."  Turner, 613 F.3d at 1223-1224; Revels v. Berryhill, 874 F.3d 648, 655 (9th Cir. 2017); Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012).  The factors to be considered in evaluating the opinion are the same factors used to evaluate acceptable medical sources.  20 C.F.R. § 404.1527(f).  These factors are the nature and extent of the treatment relationship, length and frequency of treatment, the supportability of the opinion, consistency with the medical record, specialization of the source, and other factors that either support or contradict the medical opinion.  20 C.F.R. § 404.1527(c)(2)-(6).

Here, the ALJ afforded little weight to the November 2017 opinion of Ms. Fulton that Plaintiff could not sustain regular, full-time work.  (AR 30, 934-937.)  Ms. Fulton stated that she had been seeing Plaintiff weekly since January 28, 2016, but her treatment notes only showed treatment through April 2016.  (AR 30, 835-848, 934-937.)  Ms. Fulton opined that Plaintiff would be off task more than 30% of the workday, and would miss more than five days of work per month, due to her impairments.  (AR 30, 936.)

1.    Improvement with Medication

The ALJ found that Ms. Fulton's opinion was inconsistent with the objective medical evidence in the record, including that she was often noted to be improving and was counseled to continue her current medications which indicted that her psychotropic medications were

1  controlling her symptoms.  (AR 30.)

2      The ALJ referenced the April 29, 2014 visit in which Plaintiff reported that she was very

3  anxious and that her Xanax was not helping.  (AR 370.)  Plaintiff was prescribed Xanax and

4  Zoloft.  (AR 37.)  Plaintiff was seen for a follow-up on June 10, 2014 and it is noted that she was

5  not taking the correct dose of her medication for her depression and she was advised to take the

6  correct dose.  (AR 379.)  Plaintiff was seen for an initial visit with Dr. Morgan on August 26,

7  2014, and reported a continuation of her initial symptoms.  (AR 398.)  Plaintiff's appearance

8  build/stature were noted to be within normal limits.  (AR 403.)  Eye contact was average and

9  activity was within normal limits.  (AR 403.)  Plaintiff was cooperative.  (AR 403.)  Mental

10 examination showed a depressed, anxious mood with a tearful affect.  (AR 403.)  But her speech

11 was clear, thought process was logical, and perception and cognition were within normal limits.

12 (AR 403.)  Plaintiff denied hallucinations and delusions.  (AR 403.)  Her intelligence was

13 average.  (AR 403.)  Insight was within normal limits and judgment was impaired, but within

14 normal limits.  (AR 403.)  Paxil was added to her medication regimen.  (AR 401.)

15     Plaintiff was seen for medication management with psychotherapy on April 6, 2015, and

16 reported a worsening of her symptoms.  (AR 757.)  Plaintiff was noted to have a depressed and

17 anxious mood and tearful affect.  (AR 760.)  Examination findings remained the same.  (AR

18 760.)  Plaintiff was to increase her buspirone to treat her anxiety.  (AR 758.)

19     Plaintiff was seen for medication management with psychotherapy on September 24,

20 2015.  (AR 595.)  She reported a continuation of her initial symptoms and improvement of

21 symptoms.  (AR 595.)  Plaintiff reported that she had taken Xanax because she had been out of

22 her other medication for one and a half weeks.  (AR 595.)  She had restarted her medication and

23 was less anxious since they had increased her buspirone.  (AR 595.)  She was noted to be

24 generally normal.  (AR 597.)  Mood was depressed/anxious and affect was tearful, but

25 examination findings were the same.  (AR 597-598.)

26     Plaintiff was seen for a follow-up for anxiety on March 31, 2016.  (AR 1296.)  She had

27 run out of her Xanax and had been bedridden for a week.  (AR 1296.)  On examination, she was

28 noted to be oriented to time, person, place, and situation with appropriate mood and affect.  (AR

1300.)  Memory was normal, but Plaintiff had poor insight and judgment.  (AR 1300.)  Plaintiff agreed to go into the street every day and join a kick boxing class.  (AR 1300-1301.)

Plaintiff contends that the record does not support that her symptoms were controlled with medication citing to the numerous changes in her medication to address her symptoms complaints.    Defendant argues that the conservative treatment provided to Plaintiff is inconsistent with Ms. Fulton's extreme opinion.  A review of the treatment records of Plaintiff's mental health providers shows the following.

On April 14, 2014, Plaintiff was seen by Dr. Paredes and reported anxious, fearful thoughts, compulsive thoughts, a depressed mood, difficulty concentrating, difficulty falling and staying asleep, racing thoughts and restlessness.  (AR 373.)  Plaintiff had not been receiving treatment due to lack of insurance.  (AR 373.)  On examination, she was found not to be oriented.  (AR 374.)  She had intact memory, but did not demonstrate appropriate mood or affect.  (AR 374.)  Plaintiff was extremely restless and had rapid mood changes.  (AR 374.)  She was prescribed Xanax and referred to mental health.  (AR 374.)

Plaintiff was seen by Ms. Schleicher on April 29, 2014, and reported that she was very anxious on Xanax without any improvement.  (AR 371.)

On May 14, 2014, Ms. Schleicher found Plaintiff was oriented to person, place, time, and situation with appropriate mood and affect.  (AR 377.)  Plaintiff was proscribed Zoloft.  (AR 378.)

On June 10, 2014, Plaintiff reported that she noticed some improvement in her depression, but the pharmacy had mistakenly gave her the wrong dose of her medication and it needed to be increased.  (AR 381.)

On June 20, 2014, Ms. Schleicher noted that Plaintiff was taking her anxiety medication and it was to be gradually tapered.  (AR 385.)

On July 23, 2014, Plaintiff showed up two weeks early for her appointment with Ms. Schleicher seeking a refill of her Xanax.  (AR 387.)  She did not taper her medication but was seeking a higher dose.  (AR 387.)  Plaintiff was crying stating that she needs the medication and cannot get out of bed without it and was sleeping 12 to 14 hours per day.  (AR 387-388.)  They

1   discussed not refilling the medication as there was a concern with addiction and undue reliance

2   on the drug.  (AR 389.)  Plaintiff was offered opting to get help elsewhere but declined.  (AR

3   389.)

4          Plaintiff was seen by Dr. Morgan on August 26, 2014, reporting she had anxiety and

5   functioning was extremely difficult.  (AR 398.)  Dr. Morgan assessed her with bipolar disorder

6   and generalized anxiety disorder.  (AR 401.)  Zoloft was stopped as it was not effective and Paxil

7   was restarted as it had been effective in the past to treat her depressive and anxiety symptoms.

8   (AR 401.)  On examination, Dr. Morgan observed that Plaintiff was generally normal.  (AR 403.)

9   Plaintiff's appearance, build and stature, posture, and activity were within normal limits.  (AR

10  403.)  Eye contact was average.  (AR 403.)  Attitude was cooperative.  (AR 403.)  Plaintiff had a

11  depressed, anxious mood and affect was tearful.  (AR 403.)  Speech was clear.  (AR 403.)

12  Thought processes were logical.  (AR 403.)  Perception was within normal limits.  (AR 403.)

13  Plaintiff denied hallucinations and delusions.  (AR 403.)  Intelligence was estimated to be

14  average.  (AR 403.)  Cognition and insight were within normal limits.  (AR 403.)  Judgment was

15  impaired ability to make decisions but within normal limits.  (AR 403.)

16         Dr. Morgan saw Plaintiff on September 29, 2014, and Plaintiff reported a continuation of

17  her initial symptoms but improvement of her symptoms.  (AR 405.)  Paxil was increased as it

18  had been effective to treat her depression and anxiety in the past.  (AR 405.)  Examination results

19  remained the same.  (AR 407.)

20         Plaintiff saw Dr. Morgan on November 17, 2014, and reported improvement of her initial

21  symptoms.  (AR 408.)  Paxil was continued and buspirone was increased to treat anxiety.  (AR

22  409.)  Mental examination findings remained the same.  (AR 411.)

23         Plaintiff returned on December 22, 2014, and reported worsening of her symptoms.  (AR

24  412.)  Paxil was increased and Plaintiff was to call a therapist.  (AR 413.)  Mental examination

25  findings remained the same.  (AR 415.)

26         Plaintiff saw Dr. Morgan on February 24, 2015, and reported the continuation of her

27  symptoms and improvement.  (AR 416.)  Paxil was continued and buspirone was increased to

28  treat anxiety.  (AR 417.)  Examination findings remained unchanged with the exception that

1    Plaintiff's judgment was within normal limits.  (AR 419.)

2    　　　Plaintiff saw Dr. Morgan on April 6, 2015, and reported a worsening of her symptoms.

3    (AR 426.)  Mental examination findings remained the same.  (AR 429.)

4    　　　Plaintiff returned on May 5, 2015, and reported a continuation of her symptoms.  (AR

5    430.)  Paxil was continued and buspirone was increased to treat her anxiety.  (AR 432.)  Mental

6    examination findings remained the same.  (AR 432-433.)

7    　　　On June 16, 2015, Plaintiff reported continuation and improvement of her symptoms.

8    (AR 443.)  Other than that her attitude was noted to be manipulative, mood was depressed with

9    no anxiety noted, and affect was labile, examination findings remained the same.  (AR 445-446.)

10   　　　On July 21, 2015, Plaintiff saw Dr. Morgan and reported continuation and improvement

11   of her symptoms.  (AR 616.)  Plaintiff was cooperative, her mood was noted to be depressed and

12   anxious, affect was labile and tearful, otherwise examination findings remained the same.  (AR

13   619.)

14   　　　On August 25, 2015, Plaintiff reported a continuation of her initial symptoms and that she

15   had discontinued the Latuda because it increased her blood pressure.  (AR 605.)  She was

16   referred to the Urgent Care Wellness Center because she needed a higher level of care and

17   community resources that Dr. Morgan could not provide.  (AR 606.)  Examination results were

18   the same other than affect is noted to be only tearful.  (AR 608.)

19   　　　Plaintiff saw Dr. Morgan on September 24, 2015, and reported a continuation of her

20   symptoms and improvement.  (AR 595.)  She had been out of her medication for a week and a

21   half and had taken extra Xanax.  (AR 595.)  She restarted her medication a week ago and was

22   experiencing less anxiety with the increase of buspirone.  (AR 595.)  Examination findings

23   remained unchanged.  (AR 598.)

24   　　　Plaintiff was seen by nurse practitioner DeShay on December 17, 2015, and reported

25   uncontrolled symptoms of depression and difficulty functioning.  (AR 802.)  She was assessed

26   with a Global Assessment Functioning ("GAF") score of 46.[4]  (AR 802.)  She reported moderate

27

28   _____
     [4] A GAF range of 41–50 reflects "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent
     shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep

1   symptoms of anxiety that occur weekly.  (AR 802.)

2       On December 31, 2015, Plaintiff saw Dr. McClain for her depression and back pain

3   reporting an improvement of her depression symptoms and that she was not experiencing any

4   anxious, fearful thoughts or fatigue.  (AR 805.)  She was noted to have improved since her last

5   visit.  (AR 805.)  On examination, Plaintiff was oriented to time, place, person, & situation.  (AR

6   808.)  She had appropriate mood and affect, normal insight, judgment, and memory.  (AR 808.)

7       Plaintiff was seen by LCSW Fulton on January 28, 2016.  (AR 840.)  She was noted to be

8   cooperative with behavior within cultural norms, and fearful.  (AR 845.)  Her speech was within

9   normal limits, spontaneous, elaborates.  (AR 845.)  Her mood was grief, sad/depressed; fearful;

10  negative; angry; guilt; enervated; anxious/tense/hopelessness; isolative; dysphoric; low self-

11  esteem; hyper-vigilant; ashamed; overwhelmed; worried; irritable; and embarrassed.  (AR 845.)

12  Plaintiff denied any recent symptoms of mania or hypomania.  (AR 845.)  Affect was congruent

13  and tearful.  (AR 845.)  Plaintiff was oriented to person, place, and situation.  (AR 846.)  There

14  were no hallucinations.  (AR 846.)  Delusions were paranoid and persecutory.  (AR 846.)  There

15  were no distortions of perception.  (AR 846.)  Thought flow was illogical and irrational at times.

16  (AR 846.)  Thought content was preoccupied.  (AR 846.)  Cognitive process was within normal

17  limits.  (AR 846.)  Immediate and short term memory was intact; long term memory was poor.

18  (AR 847.)  Insight was poor.  (AR 847.)  Judgment and abstractions were intact and fair.

19  General fund of knowledge was intact.  (AR 847.)  Plaintiff denied suicidal ideation.  (AR 847.)

20  Ms. Fulton found Plaintiff had significant impairment in her living arrangement due to self-

21  isolation; significant impairment in daily activities; and significant impairment in social

22  relationships.  (AR 847.)  Her prognosis was fair to poor.  (AR 847.)

23      Plaintiff was seen by Dr. McLain on February 11, 2016, for a follow-up and reported that

24  her problems were chronic.  (AR 811.)  Dr. McLain noted that Plaintiff was oriented to time,

25  person, place, and situation.  (AR 814.)  She had appropriate mood and affect, and normal

---

27  a job)."  Vanbibber v. Carolyn, No. C13-546-RAJ, 2014 WL 29665, at *1 (W.D. Wash. Jan. 3, 2014) (quoting
28  American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders Multiaxial Assessment 30,
    32 (4th ed. Text rev. 2000) (DSM-IV)).

insight, judgment, and memory.  (AR 814.)

Plaintiff saw Ms. Fulton on March 16, 2016.  (AR 838.)  She was well groomed with normal motor activity and speech.  (AR 837.)  Her behavior was irritable and manipulative.  (AR 837.)  Ms. Fulton noted that Plaintiff demonstrated learned helplessness at times and harsh self-judgment.  (AR 837.)  Plaintiff was oriented in all spheres.  (AR 837.)  Her concentration was intact.  (AR 837.)  Remote memory was moderately impaired and Plaintiff stated she could not remember much of her life prior to age 11 or 12.  (AR 837.)  Intelligence was average or below average.  (AR 837.)  Her mood was anxious, depressed, and fearful.  (AR 838.)  Affect was labile.  (AR 838.)  There were no hallucinations or illusions.  (AR 838.)  Thought content was delusions: persecution, obsessions, phobias, suicidal.  (AR 838.)  Plaintiff's judgment was moderately impaired.  (AR 838.)  Ms. Fulton noted that Plaintiff began therapy less than two months ago and needs to be seen by a new psychiatrist for medication evaluation.  (AR 839.)  All abilities were fair to poor.  (AR 839.)

Plaintiff saw Dr. McLain on March 31, 2016, for a follow-up of her anxiety.  (AR 1296.)  On mental examination, Plaintiff was oriented to time, place, person, and situation.  (AR 1300.)  She had appropriate mood and affect.  (AR 1300.)

Plaintiff was seen at the House Clinic to establish with a new psychiatrist on May 13, 2016.  (AR 932.)  She was noted to be pleasant and well-groomed.  (AR 932.)  Speech was normal in volume but a bit pressured and rapid.  (AR 933.)  Associations were intact.  (AR 933.)  Plaintiff had no abnormal thoughts.  (AR 933.)  Insight and judgment and orientation were intact.  (AR 933.)  Recent and remote memory and attention and concentration were intact.  (AR 933.)  Language was intact.  (AR 933.)  Mood and affect were congruent.  (AR 933.)

On July 27, 2016, Plaintiff was seen and reported that she did not like the Latuda and was experiencing moderate symptoms.  (AR 927.)  On examination, Plaintiff was noted to be well developed and well-nourished and in no acute distress.  (AR 929.)  Speech was normal in rate, volume, articulation, coherence and spontaneity.  (AR 929.)  Thought process was linear, coherent and goal directed.  (AR 929.)  There were no abnormal or psychotic thoughts.  (AR 929.)  Insight and judgment were intact.  (AR 929.)  Plaintiff was alert and oriented in all

spheres.  (AR 929.)   Remote and recent memory were intact.  (AR 929.)   Attention and concentration were intact  (AR 929.)  Language and fund of knowledge were intact.  (AR 929.) Mood and affect were irritable  (AR 930.)

On July 12, 2016, Plaintiff reported that her moods were much better off the Latuda. (AR 922.)  She was having mild symptoms.  (AR 922.)  Her mood and affect were euthymic, but otherwise examination findings remained the same.  (AR 924-925.)

On August 2, 2016, Plaintiff reported that she was not doing well and anxiety was taking over her moods.  (AR 917.)  She reported moderate symptoms.  (AR 917.)  She was disheveled and her speech was loud and fast.  (AR 917.)  Mood and affect were dysthymic/sad, irritable, but otherwise examination findings remain the same.  (AR 920.)

On August 23, 2016, Plaintiff reported having a difficult day and was "poor me this week."  (AR 912.)  She reported moderate symptoms.  (AR 912.)  She was disheveled, but speech was normal in rate, volume, articulation, coherence and spontaneity.  (AR 912, 914.) Examination findings remain the same.  (AR 914-915.)

Plaintiff was seen on September 20, 2016, reporting that she was not doing well and the Xanax was not helping her anxiety.  (AR 907.)  She reported moderate symptoms.  (AR 917.) Other than no notation that she was disheveled, examination findings remain the same.  (AR 909-910.)

On October 13, 2016, Plaintiff reported that she was having mild symptoms.  (AR 902.) She did not like the Wellbutrin and the change to Klonopin has helped.  (AR 902.)  Speech was pressured and mood and affect were irritable, but examination findings remain the same.  (AR 905.)

On November 23, 2016, Plaintiff reported that she had been placed on nicotine patches and phentermine and had increased anxiety, a sense of mania and paranoia.  (AR 897.)  She reported moderate symptoms.  (AR 897.)  Examination findings remain the same.  (AR 899-900.)

Plaintiff reported she was not doing as well as she would like on January 10, 2017.  (AR 892.)  She was having moderate symptoms and was compliant with her medication with no side

18

1  effects.  (AR 892.)  Speech was normal in rate, volume, articulation, coherence and spontaneity.

2  (AR 894.)  Otherwise examination findings remain the same.  (AR 894-895.)

3  　　　On February 7, 2017, Plaintiff appeared quite distraught and reported that she had been

4  unable to get her medication until three days prior.  (AR 887.)  Her symptoms are reported as

5  moderate.  (AR 887.)  She was disheveled and speech was fast in rate, loud in volume and

6  pressured.  (AR 889.)  Mood and affect were dysthymic/sad, irritable.  (AR 890.)  Otherwise

7  examination findings remained the same.  (AR 889-890.)

8  　　　Plaintiff was seen on March 7, 2017, and reported that she had not been feeling well the

9  prior week, but was better.  (AR 882.)  She reported moderate symptoms.  (AR 882.)  Plaintiff's

10  mood and affect were dysthymic/sad, but mental examination was otherwise unremarkable.  (AR

11  885-885.)

12  　　　On April 11, 2017, Plaintiff reported that she was not doing well and was more

13  depressed.  (AR 874.)  She reported moderate symptoms.  (AR 874.)  Plaintiff's mood and affect

14  were dysthymic/sad; elevated/happy.   (AR 878.)   Otherwise mental examination was

15  unremarkable.  (AR 878.)

16  　　　On June 5, 2017, Plaintiff reported that her moods were okay, but she was struggling with

17  housing issues and anxiety.  (AR 869.)  She reported moderate symptoms.  (AR 869.)  Plaintiff's

18  speech was pressured and her mood and affect were dysthymic/sad and irritable.  (AR 872.)

19  Mental examination was otherwise unremarkable.  (AR 871-872.)

20  　　　On July 3, 2017, Plaintiff reported only mild symptoms and she was compliant with her

21  medications with no side effects.  (AR 864.)  Plaintiff's mood and affect were euthymic and

22  mental examination was unremarkable.  (AR 866-867.)

23  　　　On July 31, 2017, Plaintiff reported that she was not doing well and her family was

24  telling her she is crazy.  (AR 859.)  Plaintiff was not consistently taking her medication and

25  reported moderate symptoms.  (AR 859.)  Mood and affect were dysthymic/sad and irritable, but

26  mental examination was unremarkable.  (AR 861-862.)

27  　　　On August 16, 2017, Plaintiff reported mild symptoms and that she was compliant with

28  her medication without side effects.  (AR 854.)  Plaintiff's mood and affect were dysthymic/sad

1   and improved.  (AR 857.)  Mental examination was unremarkable.  (AR 857.)

2         Plaintiff reported that she was not doing as well as she would like on September 27,

3   2017, and reported moderate symptoms.  (AR 851.)  She was compliant with her medications

4   without any side effects.  (AR 851.)  Plaintiff's mood and affect were dysthymic/sad and

5   irritable. (AR 852.) Otherwise, mental examination was unremarkable.  (AR 851-852.)

6         On November 13, 2017, Ms. Fulton completed a mental residual functional capacity

7   medical source statement.  (AR 934-937.)  Ms. Fulton's opinion was based on weekly fifty

8   minute therapy sessions since January 28, 2016.  (AR 934.)  Plaintiff had bipolar disorder,

9   severe; PTSD; past history of spouse or partner violence; past history of sexual abuse in

10  childhood; and problems related to living alone.  (AR 934.)  Prognosis states bipolar symptoms

11  are chronic with fluctuation, and overall prognosis is poor given additional history of trauma

12  commencing in childhood.  (AR 934.)  Side effects of medication are lethargy, drowsiness,

13  dizziness, and fatigue.  (AR 934.)  Ms. Fulton opined that Plaintiff most likely could not work

14  but the date of when commenced was unknown.  (AR 934.)

15        Ms. Fulton opined that Plaintiff was precluded from remembering locations and work-

16  like procedures and understanding and remembering very short and simple instructions five

17  percent of day; and precluded from understanding and remembering detailed instructions fifteen

18  percent of the day.  (AR 935.)  She was precluded from carrying out very short and simple

19  instructions five percent of day;  precluded from sustaining an ordinary routine without

20  supervision and making simple work related decisions ten percent of day; and precluded from

21  carrying out detailed instructions, maintaining attention and concentration for extended periods,

22  performing activities within a schedule, maintaining regular attention and being punctual within

23  customary tolerances, working in coordination with or in proximity to others without being

24  distracted by them, and completing a normal workday and workweek without interruption from

25  psychologically based symptoms and performing at a consistent pace without an unreasonable

26  number and length of rest periods fifteen percent of the day.  (AR 935.)  She was precluded from

27  asking simple questions or requesting assistance, and being aware of normal hazards and taking

28  appropriate precautions five percent of day;  precluded from interacting appropriately with

general public, accepting instructions and responding appropriately to criticism from supervisors, maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness, and responding to changes in the work setting ten percent of a workday; and precluded from getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, traveling in unfamiliar places or using public transportation, or setting realistic goals or making plans independently of others fifteen percent of workday.  (AR 935-936.)  Ms. Fulton opined that Plaintiff would be precluded from performing work or off task more than thirty percent of an eight hour workday five days per week due to physical and mental conditions.  (AR 936.)  She would be absent from work five or more days per month due to her conditions; would be unable to complete an eight hour workday more than five days per month due to conditions; and would be 50 percent or less able to perform a job on a sustained basis for a continuous period of six months or more.  (AR 936.)  Plaintiff had no reduced intellectual functioning.  (AR 937.)

Plaintiff argues that the multiple adjustments to her medication indicate that she was not stable and improved on medication.  The record during the time when Plaintiff was being treated by Ms. Fulton demonstrates that she did report periodic worsening of her symptoms, although it was occasionally noted to be in conjunction with her lack of compliance in taking her medications.  (AR 859, 887.)  But when she was compliant with her medications she reported improvement, mild to moderate symptoms, and no side effects.  (AR 595, 851, 854, 867, 902, 922.)  Substantial evidence in the record supports the ALJ's conclusion that Ms. Fulton's opinion was inconsistent with evidence that Plaintiff's medication were effectively managing her symptoms.

### 2. Inconsistency with Medical Evidence

In addition to being inconsistent with the records addressed above, the ALJ also noted that Ms. Fulton's opinion was inconsistent with the medical evidence that consistently showed she was fully oriented and showed appropriate mood and affect during physical examinations.  (AR 30.)  The ALJ cited a May 14, 2014 gynecological visit in which Plaintiff was noted to be oriented to time, place, person, and situation with appropriate mood and affect.  (AR 377.)

On April 3, 2015, Plaintiff was seen to establish care.  (AR 421.)  Plaintiff was noted to be oriented to time, place, person and situation with appropriate mood and affect.  (AR 421.)  She had normal memory.  (AR 423.)

Plaintiff was seen for a follow-up on August 13, 2015.  (AR 448.)  Plaintiff was noted to be oriented to time, place, person, and situation, with appropriate mood and affect.  (AR 457.)  Her memory was normal.  (AR 457.)

On September 9, 2015, Plaintiff was seen to obtain a flu shot and lab results.  (AR 587.)  She was noted to be oriented to time, place, person and situation, and mood and affect were appropriate.  (AR 591.)  Memory was normal.  (AR 591.)

Plaintiff was seen in the emergency room on December 26, 2016.  (AR 952.)  Plaintiff was alert and oriented to person, place, time, and situation.  (AR 954.)  She was cooperative with appropriate mood and affect.  (AR 954.)

Plaintiff was seen on October 27, 2017, complaining of chronic diarrhea.  (AR 1156.)  Plaintiff was noted to be oriented to time, place, person, and situation with appropriate mood and affect and normal memory.  (AR 1160.)

On December 4, 2017, Plaintiff was seen for chronic back pain, anxiety, depression, hypercholesteremia, hypothyroidism, and pre-diabetes.  (AR 1130.)  Mental examination showed she was oriented to time, place, person, and situation with appropriate mood and affect and normal judgment.  (AR 1144.)

Plaintiff argues that the findings during physical examinations were clearly cherry picked from the record, but the ALJ noted the numerous normal findings by Plaintiff's mental health providers also throughout the opinion.  (AR 26-27, 28, 29.)  Plaintiff argues that the mental health records reflect Plaintiff crying and tearful, a depressed and anxious mood and affect, irritability, labile affect, manipulative attitude, pressured speech, difficulty with concentration, and poor insight and judgment.   Defendant counters that the record notes numerous unremarkable mental status examinations that support the ALJ's finding.

Although Plaintiff was noted to be depressed and tearful and on occasions had pressured or fast, loud speech, her mental examinations after February 2015 otherwise demonstrated that

1    she was oriented in all spheres and her thought content was linear, coherent and goal directed.

2    She had no abnormal or coherent thoughts, insight and judgment were intact; concentration and

3    attention were intact; and remote and recent memory were intact.   (AR 419, 423, 429, 432-433,

4    445-446, 457, 463, 537, 598, 608, 619, 808, 814, 851-852, 862, 856-857, 866-867, 871-872, 877-

5    874, 884-885, 889-890, 894-895, 899-900, 904-905, 909-910; 914-915, 919-920, 924-925, 929-

6    930, 933, 954, 967, 979, 1013, 1173, 1189, 1241, 1259, 1275, 1288, 1300.)   The ALJ properly

7    found that Ms. Fulton's testimony conflicts with the medical evidence which is a germane reason

8    to reject her testimony.   Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001); Bayliss v. Barnhart,

9    427 F.3d 1211, 1218 (9th Cir. 2005); see also Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.

10   1984) (The ALJ can properly reject testimony that conflicts with the available medical evidence.)

11       The ALJ provided germane reasons to reject the testimony of Ms. Fulton.

12   **B.    Step Two**

13       Plaintiff argues that the ALJ erred by failing to find her lower back pain a severe

14   impairment at step two.

15       Defendant counters that there is substantial evidence in the record to support the ALJ's

16   finding that Plaintiff was able to perform light work with postural limitations.   Further,

17   Defendant argues that any error at step two would have been cured because the ALJ considered

18   Plaintiff's back pain in the residual functional assessment.

19       "An impairment or combination of impairments can be found 'not severe' only if the

20   evidence establishes a slight abnormality that has 'no more than a minimal effect on an

21   individual['s ability to work.' " Smolen, 80 F.3d at 1290 (citations omitted).   Step two is a "de

22   minimis screening devise to dispose of groundless claims."   Id.   An ALJ can only find that

23   claimant's impairments or combination of impairments are not severe when his conclusion is

24   clearly established by medical evidence.   Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005)

25   (quoting S.S.R. 85-28).   In considering an impairment or combination of impairments, the ALJ

26   must consider the claimant's subjective symptoms in determining their severity.   Smolen, 80

27   F.3d at 1290.

28       Symptoms   are   not   medically   determinable   physical   impairments   and   cannot   by

1   themselves establish the existence of an impairment.  Titles II & Xvi: Symptoms, Medically

2   Determinable Physical & Mental Impairments, & Exertional & Nonexertional Limitations, SSR

3   96-4P (S.S.A. July 2, 1996).  In order to find a claimant disabled, there must be medical signs

4   and laboratory findings demonstrating the existence of a medically determinable ailment.  Id.

5   "[R]egardless of how many symptoms an individual alleges, or how genuine the individual's

6   complaints may appear to be, the existence of a medically determinable physical or mental

7   impairment cannot be established in the absence of objective medical abnormalities; i.e., medical

8   signs and laboratory findings ....  In claims in which there are no medical signs or laboratory

9   findings to substantiate the existence of a medically determinable physical or mental impairment,

10  the individual must be found not disabled at step 2 of the sequential evaluation process."  Id.

11          Here, the ALJ found that Plaintiff's back pain was not a severe impairment finding no

12  objective medical evidence that documents a diagnosis resulting from psychological

13  abnormalities that are demonstrable by medically acceptable clinical or laboratory diagnostic

14  techniques.  (AR 24.)  The ALJ found that Plaintiff's treating providers had assessed her with

15  spondylosis without myelopathy or radiculopathy, and her symptoms were subsequently

16  managed on gabapentin, Norco, and occasional injections  (AR 24.)  The ALJ considered that on

17  April 25, 2016, Plaintiff was seen complaining of bilateral low back pain that radiates down to

18  the bilateral hips.  (AR 24, 1126.)  Plaintiff gait and station were found to be within normal

19  limits.  (AR 1128.)  Lumbar spine range of motion was abnormal at 45 degrees of true flexion,

20  10 degrees of extension, 15 degrees of right lateral flexion, 15 degrees of left lateral flexion, 10

21  degrees of right rotation, and 10 degrees of left rotation.  (AR 1128.)  Plaintiff had pain with

22  lumbar spine range of motion testing.  (AR 1128.)  Straight leg raise in the supine and sitting

23  positions was negative bilaterally.  (AR 1128.)  Slump test was negative bilaterally.  (AR 1128.)

24  Patrick Test and reverse Thomas test were positive bilaterally.  (AR 1128.)  Plaintiff's reflexes in

25  the knees and ankles were 2+ bilaterally.  (AR 1128.)  Babinski signs were negative bilaterally.

26  (AR 1128.)  There was no clonus.  (AR 1128.)  Sensation was normal in the spine and motor

27  strength was 5/5 in the ankles, knees, and hips.  (AR 1128.)  There was no tenderness to

28  palpation over the bilateral lumbar paraspinals and no tenderness to palpation over the bilateral

thoracic paraspinals.  (AR 1128.)  There was tenderness to palpation over the lumbar facet joints, but no tenderness to palpation over the bilateral SI joints.  (AR 1128.)  Plaintiff was assessed with lumbar radiculopathy; neuropathy; and dietary counseling and surveillance.  (AR 1128.)  Plaintiff's medications were refilled and it is noted that Plaintiff "reports medication is working." (AR 1128.)

On September 23, 2016, Plaintiff had bilateral lumbar and sacral medial branch blocks. (AR 24, 1104.)

Plaintiff was seen for lower back pain on November 28, 2016.  (AR 24, 1085.)  On examination, her gait and station were found to be within normal limits.  (AR 1087.)  Lumbar spine range of motion was abnormal at 45 degrees of true flexion, 10 degrees of extension, 15 degrees of right lateral flexion, 15 degrees of left lateral flexion, 10 degrees of right rotation, and 10 degrees of left rotation.  (AR 1087.)  Plaintiff had pain with lumbar spine range of motion testing.  (AR 1087.)  Straight leg raise in the supine and sitting positions was negative bilaterally. (AR 1087.)  Slump test was negative bilaterally.  (AR 1087.)  Patrick Test and reverse Thomas test were positive bilaterally.  (AR 1087.)  Plaintiff's reflexes in the knees and ankles were 2+ bilaterally.  (AR 1087.)  Babinski signs were negative bilaterally.  (AR 1079.)  There was no clonus.  (AR 1079.)  Sensation in the spine was normal and motor strength was 5/5 in the ankles, knees, and hips.  (AR 1080.)  There was no tenderness to palpation over the bilateral lumbar paraspinals and no tenderness to palpation over the bilateral thoracic paraspinals.  (AR 1080.) There was tenderness to palpation over the lumbar facet joints, but no tenderness to palpation over the bilateral SI joints.  (AR 1080.)  Plaintiff was assessed with spondylosis without myelopathy or radiculopathy, lumbar region; other disturbances of skin sensation; dietary counseling and surveillance; and admission for long-term opiate analgesic use.  (AR 1080.)  The record notes, "Based on the patient's successful response to two medial branch blocks, the patient is a good candidate for medial branch rhizotomy.  This should provide long term relief for the patient's back symptoms."  (AR 1080.)  It was noted that she was still complaining of low back pain with intermittent lower extremity paresthesia that wax and wane and left greater than right muscular pain tightness.  (AR 1080.)  She was on a controlled substance agreement and her

1 gabapentin was increased.  (AR 1080.)

2 On January 23, 2017, Plaintiff received an injection in the lumbar spine by Dr. Comrie

3 for her lumbosacral spondylosis.  (AR 24, 1079.)

4 The ALJ also considered that x-ray images taken of Plaintiff's lumbar spine on

5 November 15, 2015, showed neural foraminal stenosis, but were otherwise unremarkable.  (AR

6 24, 702-703.)   An electromyogram (EMG) study of Plaintiff's lower extremities on June 17,

7 2016, was largely normal, with no evidence of large fiber polyneuropathy or lumbar

8 radiculopathy.  (AR 24, 1122.)  In addition, a skin biopsy on September 28, 2016, for epidermal

9 nerve fiber density found only small fiber neuropathy.  (AR 24, 1096.)

10 Finally, the ALJ considered that Plaintiff's subjective symptoms were largely not

11 supported during physical examination, as her treatment providers generally reported modest

12 findings upon musculoskeletal examination, including occasional observations that Plaintiff

13 reported tenderness or moderate pain during motion upon exam.  (AR 24.)

14 The ALJ considered that on April 17, 2014, Plaintiff was seen for depression and anxiety.

15 (AR 24, 372.)  She was found to have normal range of motion, muscle strength, and stability in

16 all extremities with no pain on inspection.  (AR 374.)

17 On May 14, 2014, Plaintiff was seen for a gynecological examination.  (AR 24, 375.)

18 Extremity examination was found to be normal with no edema.  (AR 377.)

19 On April 3, 2015, Plaintiff was seen complaining of recent chest pain.  (AR 24, 420.)

20 Musculoskeletal and extremity examination was normal with no edema.  (AR 423, 463.)

21 On August 13, 2015, Plaintiff was seen for a follow-up and to get lab results.  (AR 24,

22 453.)  Musculoskeletal and extremity examination was normal with no edema.  (AR 457.)

23 On September 29, 2015, Plaintiff was seen with mild elevated lab results.  (AR 25, 587.)

24 Musculoskeletal examination shows paraspinal tenderness in the lower back.  (AR 591.)  It is

25 noted that Plaintiff is able to sit, stand, and walk without assistance.  (AR 591.)  Deep tendon

26 reflexes and straight leg raise are intact.  (AR 591.)  Extremity examination is normal with no

27 edema.  (AR 591.)

28 On October 27, 2017, Plaintiff was seen complaining of chronic diarrhea.  (AR 25, 1156.)

1  Extremity examination was normal with no edema.  (AR 1160.)

2  On December 4, 2017, Plaintiff was seen for chronic back pain after she stopped going to

3  pain management.  (AR 25, 1139.)  On musculoskeletal examination, Plaintiff had tenderness of

4  the lumbar spine and moderate pain with motion.  (AR 1144.)

5  The ALJ found a lack of objective evidence to substantiate the existence of a medically

6  determinable impairment.  (AR 25.)

7  Plaintiff contends that the ALJ failed to consider all the evidence or access the severity of

8  Plaintiff's back disorder and resulting limitations.  Plaintiff argues that her back impairment was

9  considered severe enough that she was referred to specialized pain management and in addition

10  to narcotic medications she received injections and radiofrequency nerve ablation due to the

11  severe and persistent pain associated with lumbar spondylosis and she was diagnosed with a

12  small fiber neuropathy.  But, the records that Plaintiff cites to are the specific records considered

13  by the ALJ in the opinion.

14  To the extent that the ALJ erred in not finding that Plaintiff's lower back impairment was

15  severe, any such error is harmless where the ALJ considers the limitations posed by the

16  impairment in the step four analysis.  Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007); see

17  also Buck v. Berryhill, 869 F.3d 1040, 1049 (9th Cir. 2017) (as the ALJ decided step two in the

18  claimant's favor, she could not have been prejudiced at this stage of the analysis).  As discussed

19  below, the ALJ considered Plaintiff's back impairment in addressing her residual functional

20  capacity assessment.

21  **C.    Residual Functional Capacity Assessment**

22  The Court construes Plaintiff's argument to be that the ALJ's mental and physical

23  residual functional capacity assessment is not supported by substantial evidence in the record.  A

24  claimant's RFC is "the most [the claimant] can still do despite [his] limitations."  20 C.F.R. §

25  416.945(a)(1).  The RFC is "based on all the relevant evidence in [the] case record."  20 C.F.R. §

26  416.945(a)(1).  "The ALJ must consider a claimant's physical and mental abilities, § 416.920(b)

27  and (c), as well as the total limiting effects caused by medically determinable impairments and

28  the claimant's subjective experiences of pain, § 416.920(e)."  Garrison v. Colvin, 759 F.3d 995,

1011 (9th Cir. 2014).  At step four the RFC is used to determine if a claimant can do past

relevant work and at step five to determine if a claimant can adjust to other work.  Garrison, 759

F.3d at 1011.  "In order for the testimony of a VE to be considered reliable, the hypothetical

posed must include 'all of the claimant's functional limitations, both physical and mental'

supported by the record."  Thomas, 278 F.3d at 956.

1.    Physical Residual Functional Capacity

In considering Plaintiff's residual functional capacity, the ALJ considered that on

October 21, 2015, Plaintiff completed an adult function report.  (AR 27, 272-280.)  Plaintiff

complained of low back pain (AR 272), but reported that she had no physical limitations in her

ability to sit, stand, or walk, lift objects, or climb stairs.  (AR 27, 277.)  She reported that she can

clean her house, do laundry, wash her car, "pretty much everything."  (AR 274.)  Plaintiff gets

dressed when she has to go to her grandson's football game, her daughter's birthday party, or the

casino.  (AR 273.)  When asked how far she could walk before needing to rest, Plaintiff stated

that did not pertain to her.  (AR 277.)

The ALJ also considered the adult function report completed by Plaintiff on February 22,

2016.  (AR 27, 308-316.)  Plaintiff reported that physical activities cause her to have back

spasms.  (AR 308.)  She reported that she was able to do light housecleaning, although

vacuuming, raking, and bending forward gave her back spasms but she does not need help with

housework.  (AR 310.)  Plaintiff reported no physical limitations in her ability to sit, stand or

walk, lift objects, or climb stairs, but did report difficulties with bending.  (AR 27, 313.)

Plaintiff reported that she can walk fine.  (AR 313.)  Plaintiff reported that she was seeing a pain

management doctor who had diagnosed her with lumbar radiculopathy, neuropathy, and long

term opiate use.  (AR 315.)  She had been prescribed gabapentin and Norco, was going to

physical therapy, and waiting on approval for insurance for spine injections and nerve testing.

(AR 315.)

The ALJ also considered that during the hearing, Plaintiff testified that she was receiving

treatment for lower back pain, including physical therapy, prescription medication, and

injections.  (AR 27, 52-53.)  Plaintiff testified that she has been receiving in-home support

1   services for the last several months and her in-home provider was taking care of most of the

2   household chores.  (AR 27, 53.)  She also testified that she was able to stand for about two hours

3   at one time.  (AR 27, 56, 59.)

4        The ALJ gave great weight to the opinions of the agency consultant, Dr. Bullard, who

5   found that Plaintiff retained the ability to perform a full range of light work and should be

6   afforded a work location in close proximity to a restroom.  (AR 29.)  On December 4, 2015, Dr.

7   Bullard opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds

8   frequently; can stand/walk and sit 6 hours in an 8 hour workday, was unlimited in push/pull; and

9   no postural or manipulative limitations.  (AR 78, 92.)  Dr. Bullard opined that Plaintiff must

10  work in close proximity to a bathroom.  (AR 78, 92.)

11       The ALJ also gave great weight to the opinion of agency consultant, Dr. Wong, who

12  opined that Plaintiff retained the ability to perform light work including occasional postural

13  maneuvers, and should be afforded a work location in close proximity to a restroom.  (AR 29.)

14  Dr. Wong reviewed the record on reconsideration and on March 17, 2016 issued an opinion.

15  (AR 111, 128.)  Dr. Wong considered that Plaintiff was complaining of low back pain and was

16  attending physical therapy.  (AR 109.)  Plaintiff had a negative straight leg raise, on lumbar flex

17  she could reach her fingertips to the infrapatellar border, and had a severe deficit in extension.

18  (AR 109, 833-834.)  Dr. Wong opined that Plaintiff can lift and carry 20 pounds occasionally

19  and 10 pounds frequently.  (AR 111, 128.)  She can walk and/or stand and sit 6 hours each in an

20  8 hour workday.  (AR 111, 128.)  Plaintiff can occasionally climb ramps, stairs, ladders, ropes,

21  scaffolds, balance, stoop, kneel, crouch, and crawl.   (AR 111, 128.)   Plaintiff had no

22  manipulative or environmental limitations.  (AR 112, 128.)

23       The ALJ found that the opinions of the agency physicians were based on a thorough

24  review of the medical record.  (AR 29.)  The ALJ noted that Plaintiff described significant

25  activities of daily living, including living on her home, being independent in her personal care,

26  and although Plaintiff received in-home services for her household chores and personal care, it

27  had only been for a few months prior to the hearing.  (AR 31.)

28       Plaintiff argues that the ALJ pointed to no evidence from a treating or examining

29

1    physician to support the residual functional assessment and the agency physicians did not

2    consider all of the evidence or assess the severity of Plaintiff's back impairment.  However, the

3    agency physicians opinions are substantial evidence when they are consistent with other

4    independent evidence in the record.  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).

5    Here, Plaintiff received treatment at a pain management clinic from February 22, 2016 through

6    April 17, 2017.  (AR 1069-1134.)  But on February 16, 2017, six days prior to beginning pain

7    management treatment, Plaintiff submitted the function report considered by the ALJ in which

8    she stated that she had no physical limitations but did have some difficulties with bending.  (AR

9    27, 313.)

10    Plaintiff argues that the opinions of agency physicians who did not examine the plaintiff

11   deserve little weight in the overall disability evaluation analysis.  In Penny v. Sullivan, 2 F.3d

12   953, 958 (9th Cir. 1993), the Ninth Circuit held that that ALJ erred by failing to consider the

13   claimant's pain testimony prior to having surgery for his neck and back pain.

> Penny testified extensively at the hearing about the pain and numbness that he has
> endured perpetually for years.  Although Dr. Ross' opinion indicated Penny could
> do sedentary work, the opinion was based solely upon his evaluation of the
> medical records relating to the 1988 surgery. Dr. Ross was not Penny's treating
> physician and in fact never personally examined him.  Without the benefit of
> hearing Penny's complaints of pain, we find Dr. Ross's opinion regarding
> Penny's ability to perform "sedentary work" as defined by the Social Security
> Administration to be of very limited value.

Penny, 2 F.3d at 957.

However, the instant case is distinguishable.  Plaintiff did not testify to any physical pain

or physical limitations at the February 12, 2018 hearing.  Plaintiff testified that the gabapentin is

very helpful for her back and thigh pain.  (AR 53.)  When asked about her physical limitations,

she stated that she is able to walk, but does not want to.  (AR 56.)  Plaintiff testified that she can

stand for two hours at a time and lift a ten pound sack of potatoes.  (AR 56, 59.)

The Ninth Circuit has held that a claimant must raise issues at the administrative hearings

to preserve them on appeal.  Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999), as amended

(June 22, 1999) ("at least when claimants are represented by counsel, they must raise all issues

and evidence at their administrative hearings in order to preserve them on appeal").   At the

1   hearing, Plaintiff testified that she was unable to work due to her mental impairments.  Plaintiff

2   was represented and questioned by counsel at the hearing about her physical limitations and did

3   not present any testimony that her back pain precludes her from activity that would be

4   inconsistent with the residual functional capacity assessment.

5       Further, the third party function reports in the record support the ALJ's finding that

6   Plaintiff's lower back pain does not further impact her physical abilities.  On October 23, 2015,

7   Plaintiff's daughter, Danielle Ramirez completed a report and stated that Plaintiff is able to clean

8   her house and do her laundry.  (AR 265.)  Plaintiff can walk just fine and her physical abilities

9   are not affected by her conditions.  (AR 268.)

10      On February 23, 2016, Plaintiff's daughter, Christina Ramirez, completed a third party

11  function report and stated that Plaintiff does light housekeeping (washing dishes and

12  vacuuming).  (AR 319.)  Plaintiff has difficulty bending, but her other physical abilities are not

13  affected.  (AR 322.)

14      The state agency physicians' opinions are consistent with other evidence of record and

15  constitute substantial evidence to support the residual functional capacity assessment.

16  Tonapetyan, 242 F.3d at 1149.  The ALJ's findings regarding Plaintiff's physical residual

17  capacity is free of legal error and supported by substantial evidence in the record.

18      2.   Mental Residual Functional Capacity Assessment

19      Plaintiff contends that the ALJ erred by crediting the opinions of the examining

20  physicians and then explicitly rejecting their opinion concerning the complexity of the work

21  which Plaintiff can perform.  Plaintiff argues that the ALJ rejected the opinion of the agency

22  physicians finding that restrictions to 1 to 3 step instructions was appropriate based on the

23  medical records showing that her symptoms were improving, but that a temporary improvement

24  does not contradict the opinions.  Plaintiff argues that she also complained that her symptoms

25  were worsening and the ALJ did not provide a valid reason to find she was capable of more

26  complex work.  Plaintiff argues that the jobs identified by the ALJ at step five conflict with a

27  finding that she is limited to one to step tasks.

28      Defendant counters that the opinions of the state medical consultants were consistent with

31

1    the examination findings in the record and support the ALJ's assessment of the opinion evidence.

2    Defendant contends that the residual functional capacity findings need not mirror the opinion of

3    any single medical source.   Defendant argues that the ALJ properly weighed the medical

4    opinions and the residual functional capacity assessment is consistent with the agency

5    physicians' opinions that she had moderate limitations.   Defendant asserts that the limitation to

6    non-complex and routine tasks is consistent with Plaintiff's moderate limitations.

7            Plaintiff replies that the Defendant's argument is inconsistent with the ALJ's finding that

8    Plaintiff is less limited than opined by the opinions in the record.   The agency physicians limited

9    Plaintiff to one to two step tasks and the ALJ substituted her lay opinion for that of the medical

10   assessments.   Plaintiff contends that the record shows that she is incapable of sustaining work

11   activity on a regular and continuing basis.

12           To the extent that Plaintiff argues that the ALJ failed to include the limitation opined by

13   Ms. Fulton, the ALJ took into account those limitations for which there was record support and

14   did not rely on Ms. Fulton's report or Plaintiff's subjective complaints which the ALJ found to

15   be not credible.   As discussed above, the ALJ provided germane reasons to reject the opinion of

16   Ms. Fulton and Plaintiff has waived any challenge to the adverse credibility finding by not

17   raising the issue.   Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014).   The functional

18   capacity assessment need not contain limitations that the ALJ properly finds to be unsupported

19   by the record.   Bayliss, 427 F.3d at 1217.

20           Plaintiff challenges the ALJ's rejection of the opinions of Drs. Garcia and Collado who

21   opined that Plaintiff was limited to simple, routine work involving one and two step instructions.

22   (AR 29, 80, 94, 113-114, 129-130.)   The ALJ gave some weight to the opinions of Drs. Garcia

23   and Collado but found that because Plaintiff's symptoms were often noted as improving, a

24   restriction to 1 to 3 step instructions is appropriate.   (AR 29-30.)

25           The ALJ's finding that Plaintiff's symptoms were improving and that she was therefore

26   capable of more complex work than opined by the agency physicians is not supported by the

27   record.   Specifically, at the time that Drs. Garcia and Collado issued their opinions, Plaintiff was

28   consistently found to have generally normal findings on mental examination.   By February 24,

2015, Plaintiff had begun treatment for her mental conditions, there had been several adjustments

her medication, and she was consistently found to have unremarkable mental examinations,

including a logical thought process, normal perception, cognition, insight, and judgment.

On November 25, 2015, Dr. Garcia opined that Plaintiff had mild restrictions in activities

of daily living and difficulties in maintaining social functioning, and moderate difficulties in

maintaining concentration, persistence, and pace.  (AR 76, 90.)  Plaintiff was not significantly

limited in her ability to remember locations and work-like procedures or to understand and

remember very short and simple instructions.  (AR 79, 93.)  She was moderately limited in

ability to remember and understand detailed instructions.  (AR 79, 93.)  Dr. Garcia found that

Plaintiff was limited to simple, repetitive tasks.  (AR 79, 93.)

He also opined that Plaintiff was not significantly limited in her ability to carry out very

short and simple instructions, maintain concentration and attention for extended periods, perform

activities within a schedule, maintain regular attendance, and be punctual within customary

tolerances; sustain an ordinary routine without special supervision; work in coordination with or

in proximity to others without being distracted by them; make simple work related decisions, to

complete a normal workday and workweek without interruptions from psychologically based

symptoms, and to perform at a consistent pace without an unreasonable number and length of

rest periods.  (AR 79, 39.)  He opined that Plaintiff was moderately limited in her ability to carry

out detailed instructions, and limited her to simple repetitive tasks.  (AR 79, 93.)  Plaintiff had no

issues with social interaction.  (AR 80, 94.)  She was able to understand and remember work

locations and procedures of a simple, routine nature involving 1-2 step job tasks and instructions.

(AR 80, 94.)  She could maintain concentration and attention for the above in two hour

increments.  (AR 80, 94.)  She was able to sustain 8 hour a day/40 hour work schedules on a

sustained basis.[5]  (AR 80, 94.)  Plaintiff was able to relate to and accept direction from

supervisors and could remain socially appropriate with co-workers and the public without being

---

[5] In her reply, Plaintiff argues that the agency physicians found that she lacked the capacity to perform tasks on a regular and consistent basis (ECF No. 21 at 3), but both Drs. Garcia and Collado found that Plaintiff would be able to sustain 8 hour/40 hour work schedules on a sustained basis (AR 80, 114).

1  distracted by them.  (AR 80, 94.)  Plaintiff was able to travel, avoid workplace hazards, respond

2  to change and set realistic goals independently.  (AR 80, 94.)

3       On subsequent mental examination, Plaintiff was noted to have improved and continued

4  to be found to be oriented in all spheres with normal memory, insight and judgment.  (AR 805,

5  808, 814.)

6       On March 18, 2016, Dr. Collado reviewed the record on reconsideration and affirmed the

7  opinion of Dr. Garcia.  (AR 110, 113-114, 126, 129-130.)

8       The medical record after March 18, 2016, as discussed above, contains similar generally

9  unremarkable objective findings on mental examination.  Although the ALJ found that the record

10 had indications that Plaintiff had improved with treatment, no medical opinion has opined that

11 Plaintiff is capable of more complex work than opined by Drs. Garcia and Collado.

12 Accordingly, the residual functional capacity is not supported by substantial evidence in the

13 record.  See Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993) (a hypothetical that does not

14 contain all the claimant's limitations has no evidentiary value to support the conclusion that the

15 plaintiff can perform jobs that exist in the national economy).

16       Defendant argues that the limitation to unskilled work is consistent with Plaintiff's

17 moderate limitations, however, the ALJ found that Plaintiff was capable of more complex work

18 than opined by the medical opinions in the record.  Absent adequate explanation of the record,

19 without specific support from a medical source, and with no testimony from a medical expert,

20 the ALJ appears to have defined her own limitations for Plaintiff.  The Court finds that this was

21 error.  See Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (the ALJ was not qualified

22 as a medical expert and therefore could not permissibly go outside the record to consult medical

23 textbooks for purpose of making his own assessment of the claimant's physical condition);

24 Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, ... the ALJ was simply not

25 qualified to interpret raw medical data in functional terms and no medical opinion supported the

26 determination."); Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to

27 the temptation to play doctor and make their own independent medical findings.").  Further, any

28 such error is harmful as the ALJ was not presented with a hypothetical that included the

1  limitation to simple one and two step tasks and instructions.

2  The Ninth Circuit has "devised a three-part credit-as-true standard, each part of which

3  must be satisfied in order for a court to remand to an ALJ with instructions to calculate and

4  award benefits: (1) the record has been fully developed and further administrative proceedings

5  would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for

6  rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly

7  discredited evidence were credited as true, the ALJ would be required to find the claimant

8  disabled on remand." Garrison, 759 F.3d at 1020.

9  In this instance, the only medical opinions in the record are those of Drs. Garcia and

10 Collado which find that Plaintiff retains the ability to perform one and two step tasks and

11 instructions.  Crediting these opinions as true, remanding for further administrative proceedings

12 will serve a useful purpose as it is not clear on the current record whether Plaintiff would be

13 disabled given the limitation to one to two step tasks.  On remand, the ALJ will need to further

14 develop the record to determine if there are jobs that exist in the national economy that Plaintiff

15 can perform.

16 Accordingly, this matter shall be remanded for the ALJ to determine if work exists in the

17 economy which Plaintiff can perform given her limitation to one to two step job tasks and

18 instructions.

19 **C.    Duty to Develop the Record**

20 Plaintiff contends that the ALJ was required to obtain a personal medical examination

21 because no treating or examining physician opined on her limitations and the agency physicians

22 failed to examine all evidence or assess the severity of her back disorder and limitations.

23 Defendant counters that the ALJ only has a duty to develop the record where it is

24 ambiguous or inadequate to allow for proper evaluation of the evidence and that is not the

25 situation here.  Defendant contends that Plaintiff was to establish disability and she did not do so

26 here and her failure does not shift the duty to the ALJ to seek out evidence for her.

27 Plaintiff counters that since no medical professional assessed the impact of her diagnoses

28 and symptoms in light of the longitudinal record they did not consider the significance of her

worsening symptoms.

When applying for disability benefits, the claimant has the duty to prove that she is disabled.  42 U.S.C. § 423(c)(5)(A).  The ALJ has an independent "duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  Widmark v. Barnhart, 454 F.3d 1063, 1068 (9th Cir. 2006) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)).  The ALJ has a duty to further develop the record where the evidence is ambiguous or the ALJ finds that the record is inadequate to allow for proper evaluation of the evidence.  Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); Tonapetyan, 242 F.3d at 1150.

A specific finding of ambiguity or inadequacy in the record is not required to trigger the necessity to further develop the record where the record itself establishes the ambiguity or inadequacy.  McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011).  The facts in this case are not similar to other instances in which the ALJ was found to have a duty to further develop the record.  See Tonapetyan, 242 F.3d at 1150-51 (ALJ erred by relying on testimony of physician who indicated more information was needed to make diagnosis); McLeod, 640 F.3d at 887 (ALJ erred by failing to obtain disability determination from the Veteran's Administration); Bonner v. Astrue, 725 F.Supp.2d 898, 901-902 (C.D. Cal. 2010) (ALJ erred where failed to determine if claimant's benefits were property terminated or should have been resumed after his release from prison); Hilliard v. Barnhart, 442 F.Supp.2d 813, 818-19 (N.D. Cal. 2006) (ALJ erred by failing to develop record where he relied on the opinion of a physician who recognized he did not have sufficient information to make a diagnosis).

The cases cited by Plaintiff are distinguishable.  First, Plaintiff cites to cases where the ALJ did not obtain the current treatment records arguing that the ALJ was required to obtain the recent records of LCSW Fulton.  But the record contains the current treatment records of Plaintiff's treating medical providers which the ALJ discussed and found were inconsistent with Ms. Fulton's opinion.  Since the contains the current treatment records which are inconsistent with Ms. Fulton's opinion, there is no ambiguity in the record precluding the ALJ from deciding the weight to be provided to her opinion.

1    Plaintiff argues that the ALJ was required to develop the record by getting a consultative

2    examination because the agency decisions did not consider all the treatment records through the

3    date of the decision citing to Molina v. Berryhill, No. 2:17-CV-01991 CKD, 2018 WL 6421287

4    (E.D. Cal. Dec. 6, 2018).  In Molina, the claimant fell and injured her knee requiring surgery.  Id.

5    at *3.  Six months after the surgery, she was assaulted at work and sustained injury to her neck

6    and shoulder and reinjury to her knee.  Id. at *4.  She had an MRI of her knee which showed "an

7    oblique tear and chondromalacia at the root attachment, posterior horn and midbody of medial

8    meniscus" and was prescribed a cane.  Id.  She went through physical therapy and at the

9    administrative hearing testified that she had underwent a second knee surgery earlier that year

10   but there was no documentation of it in the medical record.  Id.  The agency physicians had

11   reviewed the record prior to the claimant being assaulted at work, and the ALJ reviewed the

12   record including the MRI results, did not mention the claimant's neck and shoulder injury, and

13   made an independent analysis of the claimant's ability to work on a function by function basis.

14   Id.

15   In this instance, Plaintiff alleges a worsening of her medical condition, but the agency

16   physicians reviewed the record including the medical record just prior to her beginning pain

17   management, the physical therapy notes regarding her low back limitations during the time that

18   she was attending pain management which reflected the pain and range of motion limitations,

19   and her statement that she had no physical limitations other than difficulty bending.  As the

20   Ninth Circuit has held, "there is always some time lapse between a consultant's report and the

21   ALJ hearing and decision, and the Social Security regulations impose no limit on such a gap in

22   time.  At the time they issued their opinions, the non-examining experts had considered all the

23   evidence before them, satisfying the requirements set forth in 20 C.F.R. § 404.1527(c)(3).  Owen

24   v. Saul, 808 F. App'x 421, 423 (9th Cir. 2020).[6]

25   Further, while Plaintiff argues that there was a worsening of her back condition, the ALJ

26   considered her testimony that she did not have any physical limitations other than difficulty

27

28   [6] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1   bending due to her low back pain.  The ALJ adopted those limitations opined by the agency

2   physicians that had reviewed the record and Plaintiff's difficulty bending was incorporated into

3   the residual functional capacity by limiting her to occasional postural activities.

4        Finally, although Plaintiff argues that her mental condition waxed and waned, the ALJ

5   considered the evidence in the record that despite her complaints of fluctuating symptoms,

6   Plaintiff had generally unremarkable mental status examinations and the record reflected that she

7   improved on medication for her anxiety and depression.  On the record presented here, the Court

8   finds the ALJ did not err by failing to further develop the record.

9                                                **V.**

10                               **CONCLUSION AND ORDER**

11       Based on the foregoing, the Court finds that the ALJ did not err in rejecting the opinion

12  of Ms. Fulton and the physical residual functional assessment is supported by substantial

13  evidence in the record.  However, the mental residual functional capacity was not supported by

14  substantial evidence in the record and crediting the physician opinions as true requires this

15  matter to be remanded for further administrative proceedings.

16       Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the

17  Commissioner of Social Security is GRANTED and this matter is remanded back to the

18  Commissioner of Social Security for further proceedings consistent with this order.

19

20  IT IS SO ORDERED.

21  Dated:   **November 5, 2020**

_____
UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28